# GLENN A. GARBER, P.C.

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

July 13, 2015

Honorable Lewis A. Kaplan
District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:**   *United States* **v.** *Vladamir Tsastsin (Timur Gerassimenko)*
        **Docket No. 11 Cr. 878-003 (LAK)**

Dear Judge Kaplan:

This letter memorandum is submitted in support of Timur Gerassimenko's position on sentencing. Sentencing is scheduled for July 23, 2015.

## Guidelines

Mr. Gerassimenko, a man with no criminal history, pled guilty on March 19, 2015, to wire and computer fraud pursuant to 18 U.S.C. §§ 1343 and 1030. Pursuant to a plea agreement, the parties stipulated to a Guideline calculation, which was followed by the Probation Department in the Pre-sentence Report ("PSR").

> Base Offense Level 7 (USSG § 2B1.1(a)(1))
> Plus 16 Levels because the loss is more than $1 million (USSG § 2B1.1(b)(1)(I))
> Plus 6 Levels because there were more than 250 victims (USSG § 2B1.1(b)(2)(C))
> Plus 2 Levels due to sophisticated means (USSG § 2B1.1(b)(10))
> Minus 3 Levels for acceptance of responsibility (USSG § 3E1.1(a) and (b))
> _____
> Total Offense Level 28

*PSR at ¶s 13(a)-(g) and 58-71*.  At a Criminal History Category I, a TOL of 28 yields a sentencing range of 78-97 months.  *PSR at ¶s 13(h)-(i) and 98*.  There is no mandatory minimum and under the plea agreement Mr. Gerassimenko is free to apply for a variance below the Guidelines based upon the factors set forth in 18 U.S.C. §

1

# GLENN A. GARBER, P.C.

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

3553(a).  Based upon the "history and characteristics of the defendant, as well as the need to avoid unwarranted disparities among defendants" the Probation Department recommends a variance to 42 months.  *PSR at 27-78.*

For these reasons and others explained below, Mr. Gerassimenko asks the Court to essentially follow the Probation Department's recommendation.  With jail time credit for time Mr. Gerassimenko spent in Estonia for essentially the same offense as the instant one, this would amount to a sentence of time served.1

## Authority to Vary Below the Guidelines

In *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005), the Supreme Court held that the Federal Sentencing Guidelines are merely adversary.  In *Gall v. United States*, 553 U.S. 38, 41, 128 S.Ct. 586, 591 (2007), it clarified that a sentencing court has wide discretion to impose a sentence outside a guideline range.  U.S. at 41, S.Ct. at 591.  Elevating the factors under § 3553(a) above the sentencing guidelines, the *Gall* Court held that the sentencing judge "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented."  U.S. 50, S.Ct. 596-597.   To hold otherwise would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." U.S. at 47, S.Ct. 595.

---

1 Mr. Gerassimenko spent 45 months in custody.  The following chart illustrates time served in Estonia and the United States:

**Estonia (962 days or 32 months with 20 months attributable to pretrial detention and 12 months awaiting extradition to the U.S.)**
56 days (1.9 months) in local police custody: 11/8/11 to 1/2/12 (*PSR at 1*)
906 days (30.2 months) in Tallinn Prison: 1/3/12 to 6/26/14 (*Let. From Tallina Vangla, Ex. A*)
**U.S.**
391 days (13 months) MCC: 6/27/14 to 7/23/15 arrival in U.S. to sentencing (*PSR at 1*)
**Total 1353 days or 45.1 month**

# GLENN A. GARBER, P.C.
## ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

Although a sentencing court is "require[d]… to take account of the Guidelines together with other sentencing goals" the decision is ultimately governed by 18 U.S.C. 3553(a). *Booker,* U.S. at 224, S.Ct. at 744; *United States v.Cavera,* 550 F.3d 180, 188 (2d Cir. 2008).

Foremost, Section 3553(a) requires a district court to "impose a sentence, sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" [below] and to "consider" the following factors "in determining the particular sentence to be imposed":

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines…

(5) any pertinent policy statement…

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense

In the instant case, a variety of factors militate in favor of a sentence of time served as requested herein.

# GLENN A. GARBER, P.C.
ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

## The Offense and DNS Changer

Timur Gerassimenko was charged along with Dmitri Jegorov, Konstantin Poltev, Vladimir Tsastsin, Andrey Taame, Valeri Aleksejev, and Anton Ivanov[2] for a computer fraud offense. At the heart of the scheme was an emerging technology that changed DNS settings[3] in a user's computer and diverted the users to certain websites and advertisements. By going to these locations defendants and their co-conspirators were able to generate revenue based on internet traffic agreements with online advertisers. Computer users acquired the DNS Changer through the downloading of software that enabled the viewing of videos online.[4]

Mr. Gerassimenko and some of his co-defendants – Tsastsin, Jegorov and Poltev – were also prosecuted and tried in Estonia for essentially the same conduct charged in the U.S. Indictment.[5] *English Translation of Estonian Trial Court Decision*, "ETCD," at § 1.3, Ex. B. Even though this case follows the Estonian prosecution, that

---

[2] Aleksejev pled guilty and was sentenced to 48 months in jail. Ivanov pled guilty and was sentenced to time served. And, Tsastsin recently pled guilty under a plea agreement, which like Gerassimenko carries a range of 78 to 97 months, and his sentencing is scheduled to occur last. Taame has not been apprehended.

[3] "DNS" means Domain Name System or Domain Name Server.

[4] As further explanation, computer users connect to websites through domain names. These domain names must be converted or "resolved" to numerical form called Internet Protocol ("IP") addresses. Computer users are connected to DNS servers, typically through their internet service provider (ISP), to resolve IP addresses so the user can then be directed to websites associated with domain names. The software at issue in this case caused computers to connect to DNS servers that were controlled by Rove Digital, a company owned by Tsastin. Through these servers, users were directed to websites with certain advertisements that when clicked generated revenue on a pay-per-click basis. *See Indictment at ¶s 20 to 33, Dkt. Entry 4.*

[5] Aleksejev, who was previously sentenced by this Court, was not prosecuted in Estonia. Thus, unlike Mr. Gerassimenko, he was not in lengthy pre-trial detention in Estonia and was not subjected to the trauma of two prosecutions for the same offense.

# GLENN A. GARBER, P.C.

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

prosecution came after the U.S. Indictment, and the authorities in Estonia relied upon the U.S. indictment and the investigation and evidence developed by the United States.

After a trial before three judges who considered evidence over the course of six months from April to December 2013, which included testimony from highly regarded experts and the defendants, Mr. Gerassimenko was fully acquitted. The Estonian trial court ultimately concluded that while the defendants may have engaged in aggressive business practices that could be the subject of a "civil legal dispute and possible civil liability," they did not commit any crimes. *ETCD at §§ 2.1, 4.3.4.*

As discussed at the Estonian trial, DNS manipulation, like DNS changer in this case, was akin to adware and was being used by U.S. companies for commercial purposes.6  *See* Nicholas Weaver, Christian Kreibich, and Vern Paxson, *Redirecting DNS for Ads and Profit*, available at http:/www.icir.org/Christian/publications/2011-foci-dns.pdf (discussing the same technology underlying DNS Changer and its exploitation in the market place); *see also* Chao Zhang, Cheng Huang, Keith W. Ross, David A. Maltz, and Jin Li, *Inflight Modifications of Content: Who are the Culprits?* available at http:/www.research.microsoft.com/en-us/um/people/chengh/papers/revealer11.pdf. (See same at 6, listing companies that engage in the practice). Moreover, those companies were not being criminally prosecuted. Pivotal for the Estonian trial court was the fact that computer users were warned multiple times during the download process that installation could change network settings for commercial purposes. *ECTD at §4.3.4.*

---

6 According to Wikipedia: **Adware**, or **advertising-supported software**, is any software package which automatically renders advertisements in order to generate revenue for its author. The advertisements may be in the user interface of the software or on a screen presented to the user during the installation process. The functions may be designed to analyze which Internet sites the user visits and to present advertising pertinent to the types of goods or services featured there. The term is sometimes used to refer to software that displays unwanted advertisements. http://en.wikipedia.org/wiki/Adware.

5

# GLENN A. GARBER, P.C.
ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

After the acquittal and extradition to the United States the judgment of the Estonian trial court was reversed by the Circuit Court of Appeals and affirmed by the Estonian Supreme Court.  The reversal essentially rested on the proposition that computer users typically do not read licensing agreements when downloading software and that defendants, took advantage of this fact and knowingly committed a criminal fraud.  The Supreme Court imposed an order of conviction and sentenced Mr. Gerassimenko to an additional 22 months in prison to be served after his return to Estonia from the United States.[7]

### Timur Gerassimenko and his Involvement in the DNS Changer Project

Mr. Gerassimenko is an educated businessman, skilled in web design and programing.  Overcoming the economic hardships in Estonia, Mr. Gerrasimenko worked his way from a modest upbringing, achieved an education in Information Technology ("IT"), and developed skills with global marketability.  Nearly 40 letters of support are written on his behalf. *See Ex.* I.  He is described as an honest, decent family man with a strong work ethic and positive and affable demeanor.

Prior to his arrest in Estonia, at the age of 31, his career and life were on the rise.  He had a well-respected business, Infradata, with an office, and employees.  He paid taxes, negotiated contracts and was accessible to the client's he served.  He had built a solid foundation to support his family and contribute to the IT field and society at large.

The DNS Changer was created by computer programmers Aleksei Lantsov and Vladimir Stulov who were hired by Vladimir Tsastsin, and the DNS servers used to facilitate the redirection of internet traffic were leased by

---

[7] The Estonian sentence amounts to 42 months – with 20 months of credit for time served in pre-trial detention in Estonia.

# GLENN A. GARBER, P.C.
ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

Tsastsin through his company Rove Digital. Infradata entered into a contract with Rove Digital to perform a specific task – write script for advertisers to ensure that payments were received on a pay-per-click basis.

**Fraud Guidelines are a Poor Estimator for Appropriate Punishment**

Mr. Gerassimenko by no means seeks to minimize his conduct or the extent of the fraud. For sure a large numbers of computers were affected by the DNS changer and the underlying fraud was complex. Clearly, Mr. Gerassimenko acknowledges these facts and, indeed, stipulated to a loss amount of $1 million to $2.5 million, and enhancements for mass victims and sophisticated means. *PSR at ¶ 13*. However, this does not mean that the Guidelines range of 78 to 97 months is fair for him in this case. Rather, with full recognition of the crime and acceptance of responsibility with great remorse and contrition, it is contended that a variance based on the skewed weight placed on loss and enhancements by the Sentencing Commission Guidelines – putting aside the other grounds for variance in this case – is appropriate. On this score, Mr. Gerrasimenko joins in the excellent arguments of co-counsel William Stampur set forth in his sentencing memorandum for co-defendant Valeri Aleksejev, and only raises the highlights herein. See *United States v. Aleksejev,* 1:11-cr-000878-LAK, Doc. 34, at 4-11.[8]

Without question, this Court has the discretion to disagree with Guidelines that dole out punishment that is not in line with the nature of the crime or the culpability of an offender. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). Disagreement may be especially appropriate in white-collar cases. *See United States v. Herink*, 2012WL3112002 *5 (D. Neb., July 30, 2012). The Guidelines for these crimes have increased markedly over the years since their inception in 1987, in a misguided reaction to what was perceived as low sentences. *See* Alexandra

---

8 These arguments appeared to resonate with the Court, as it varied from a range of 97 to 121 months to 48 months for Aleksejev, at least in part due to the overstated punishment called for by the fraud Guidelines. *Aleksejev,* 1:11-cr-000878-LAK, Doc. 43, Sentencing Transcript, at 11.

7

# GLENN A. GARBER, P.C.
ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

M. Walsh, Andrew George & Julie Rubenstein, *Re-examining the Sentencing Guidelines for Federal Securities Fraud Cases,* 89 Crim.L.Reporter 833(Sept. 21, 2011).  These increases, however, have been criticized as being disproportionate to the crimes and too heavily based on loss amounts and specific offense characteristics without supporting data to establish why such increases meet the goals of sentencing.  *See* James E. Felman, *Change in Federal Criminal Justice,Views from the defense and Policy Advocacy Communities: The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 Fed.Sent.Rep. 138 (Dec. 2010); Alan Ellis, John R. Steer & Mark H. Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Loss Offenses,* 25 Crim. Just. 34 (2011)("as legislatively directed enhancements have proliferated, particularly within the fraud guideline, the objective of proportionality among offenses has gone by the wayside."); *United States v.* Emmeneger, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004)(criticizing guidelines "excessive weight" on loss as a sentencing factor); *United States v. Spencer*, 700 F.3d 317, 325 (8th Cir. 2012)(Bright, J. dissenting)("the fraud guidelines… no longer provide a reasonable starting point for sentencing [beause a]djustments based on the amount of the loss lead to astronomical sentences that have little connection to criminality."); *United States v. Adelson*, 441 F.Supp.2d  506, 514 (S.D.N.Y. 2006)(noting the ignored "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective white-collar offenders."); *see also* Richard Frase, *Punishment Purposes,* 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?,* 23 S. Ill. U. L.J. 485, 492 (1998).

In the instant case, Mr. Gerassimenko played a specific role by creating websites to facilitate only a part of the DNS changer project.  Moreover, while the DNS changer affected a large number of computers, the software module that enabled the DNS change could easily be uninstalled.  Furthermore, it is impossible to know how many people were truly impacted by the DNS changer and what loss of if any was sustained by the end users or potential

8

**GLENN A. GARBER, P.C.**

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

advertisers that may have lost revenue due to the redirection. Rather, the Guidelines loss range of $1 to 2.5 million is more connected to gains and represents a somewhat arbitrary basis for culpability and punishment.

It is also noteworthy that as of November 1, 2015, the fraud Guidelines under U.S.S.G. § 2B1.1 should decrease by 2 points for the instant offense. http://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/20150430_Amendments.pdf, at 15 and 16.

### Disparity

A few important points come to mind, comparing Mr. Gerassimenko to Aleksejev, who received a sentence of 48 months. Aleksejev and Gerrassimneko were both essentially programmers who were employed by Tsastsin to work on his DNS changer project. And, although Gerrassimenko owned a company, Infradata, that contracted with Tsastsin and thus received more profits from the offense, Gerassimenko did not even come close to benefiting like Tsastsin. According to the Estonian Courts Gerassimenko's company received $1.2 million for its part, whereas Tsastsin's company received approximately $16 million.

Furthermore, Gerassimenko, unlike Aleksejev, was prosecuted in Estonia for the same offense and thus had to endure the trauma of two prosecutions. The uncertainty and stress associated with being twice placed in jeopardy is undoubtedly a grave form of punishment that Aleksejev was not saddled with. In addition, Alekesjev only spent 7 months in Estonian custody prior to his extradition, whereas Gerassimenko served 32 months. Without question, given the horrendous conditions Gerrasimenko's faced under extended confinement, there is significant reason to offset any role difference that the Court may find between the two offenders.

### Harsh Confinement

Before his extradition, Mr. Gerassimenko spent 32 months in Estonia. For more than 30 months of that time he was in Tallinn Prison, a terrible place. It was built in the 1940s as a POW camp for Nazi soldiers. Over the

9

# GLENN A. GARBER, P.C.

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

years it has come under attack for human rights violations associated with the extremely harsh conditions. Attached as Exhibit C are photographs illustrating how it appeared during Mr. Gerassimenko's incarceration there.  It has not been renovated for over decade and it resembles a decrepit, abandoned insane asylum from a horror movie.

There was only one hour of "recreation" in a small concrete box, shared by 5 or 6 inmates, with no exercise equipment, and which was often partly filled with snow and ice.  *See photograph depicting recreation cell with concrete walls and metal grid ceiling.*  Showers, which weree luke warm, were limited to once a week for 20 minutes, and there were limited stalls, thus requiring 6 inmates to simultaneously shower together.

Mr. Gerassimenko was housed in a cell holding 5 and 6 inmates.  The living quarters were cramped with virtually no room for movement.  The toilet was a hole in ground that Mr. Gerassimenko and his bunk mates had to squat over to defecate in. 90 percent of the inmates at Tallinn are drug abusers with Hepatitis C, HIV and infectious diseases.  The cells were dirty and moldy and ventilation was poor.   There was only one small window for fresh air.  The heating system did not work properly and temperatures would get as low as minus 30 degrees Fahrenheit.  As result, in the winter months inmates had to choose between the stench of human feces and body odor and freezing.

Food was served through a rusty portal in the cell doors.  Meat and chicken was only served twice a year (Christmas and New Year's).  The other times inmates were fed cabbage, potatoes, soy sausage and porridge which looks like slop.  There were no fruits, vegetable or vitamins.

Mr. Gerassimenko served the first 8 months in isolation with no communication with anyone.  Then he was only permitted one 5-minute phone call per week and on one 1-hour visit per month in a no-contact room through a glass window and a phone.

Needless to say, time in Tallinn Prison was a living hell.

10

# GLENN A. GARBER, P.C.

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

Shortly before Mr. Gerassimenko's incarceration there, in 2010 Tallinn was supposed to be shut due to unacceptable confinement conditions. However, the Estonian government did not follow through with the plans. Tallin has also been the subject of law suits and condemnation for violations of human rights. *See Tunis v. Estonia, Application No. 429/12, Final Judgment Mar. 19, 2014, Ex. D; Response of the Estonian Government to the European Committee for the Prevention of Torture and Inhuman Treatment, May 6 to June 6 of 2012, Ex E.*

There is ample legal authority for this Court to take harsh prison conditions into account and lower Mr. Gerassimenko's sentence. *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United states v. Pressley,* 345 F.3d 1205 (11th Cir. 2003); *United States v. Mateo*, 299 F.Supp.2d 201, 211-12 (S.D.N.Y. 2004); *United States v. Francis*, 129 F.Supp.2d 612 (S.D.N.Y. 2001); *United States v.* Francis, 129 F.Supp.2d 612, 616 (S.D.N.Y. 2001); United *States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996); *United States v. Lara*, 905 F.2d 599, 603-04 (2d Cir. 1990); *United States v. Gallo*, 653 F.Supp. 320, 335-39 (E.D.N.Y. 1986); *United States v. Bakea*, 987 F.Supp. 44, 55 (D.Mass. 1997). Indeed, if ever there was a case for such consideration this is the one.

Moreover, Mr. Gerrasimenko was incarcerated at the Metropolitan Correctional Center (MCC) for over a year. While not as bad as Estonian jails it is no "walk in the park." Indeed, MCC is a facility known for particularly harsh conditions, which courts have found may justify a downward adjustment of sentence. *Carty*, supra; *Mateo*, supra; *Francis*, supra; *Hernandez-Santiago*, supra; *Lara*, supra; *Gallo*, supra; *United States v. Mendola,* 03-CR-449 (S.D.N.Y. 2005). Among the difficult conditions at MCC that make detention there harder than at other facilities are significant overcrowding, inadequate bathroom facilities, lack of ventilation, and limited access to outdoor recreation. In addition, the educational and rehabilitative programming is inadequate at MCC compared to other facilities, especially for non-U.S. citizens like Mr. Gerassimenko who are ineligible for even the

11

**GLENN A. GARBER, P.C.**

ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

sparse programs offered.  To make matters worse, Mr. Gerassimenko was confined continents away from his home, across an ocean, and he did not receive a single visitor.

Notably, despite these impediments Mr. Gerassimenko made the best of his circumstances.  While at MCC he took advantage of available courses.  *Certificates from BOP programs attached, Ex. F*.  All the while, he stayed incredibly positive and focused on being the best person he can be for his family upon his release.

### Family and Hardship

For Mr. Gerassimenko his decision to get involved with the DNS changer project was the biggest mistake he had ever made in his life; a mistake that he has paid dearly for.  Not only did it devastate his career, but it created an unimaginable nightmare for him and his family.[9]

Mr. Gerrasimenko's wife, Svetlana Janisevski,  is 33 years of age Marriage Certificate , Ex G.  She obtained a degree in philosophy from the University of Tartu, where she met Timur in 2001 who was then teaching at the University.  *Let from Svetlana Janisevski, Ex. I.* She describes him as a "man with a good sense of humor" "sociable" "very nice and kind[,]" "sometimes too trusting."  They were married in 2005 and had two daughters ▬▬▬▬▬▬▬.  Both were very young – ▬▬▬▬▬▬▬ – when Timur was arrested in Estonia in 2011.  Indeed, there lives were turned upside down.  Sveltlana states: [t]his current situation is very difficult for me and sometimes I lose my heart.  While Timur is very optimistic [] he worries about the children much[.]  [B]efore the arrest they spent a lot of time together…"  They have been without their father for nearly four years – "half their life."  The children are unaware of the real reason for their father's absence.  Without question, their loss during

---

9 Attached hereto as Exhibit H and I are Mr. Gerassimenko's and nearly 40 letters of support from family, friends and business associates praising Mr. Gerassimenko for his kind and contentious nature.  Collectively, they portray an account of a good man who made a terrible decision; one that he and his family suffer with every day he remains in jail.

12

# GLENN A. GARBER, P.C.
ATTORNEYs AT LAW
GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

their formative years has been devastating for them and one of the most "painful issue" that the family has had to endure.

After the arrest, Svetlana stopped her studies at the Estonian Academy of Art and sought employment. Unfortunately, she was unable to obtain a job that would even cover their rent.  As a result, her and her daughters were forced to move in with Mr. Gerrasimenko's mother.  However, just this month, after the order of conviction by the Estonian Supreme Court, the Estonian government seized his mother's home as it was believed to be linked to proceeds from the fraud.  Svetlana and the girls were again displaced and now live in a tiny apartment in the city, paid for with charity and borrowed money from family and friends.

Upon Mr. Gerassimenko's release there is a job fulltime job awaiting him in Estonia with EasySoft, an IT company that handles technology research and programming for large companies such as Microsoft, Rockwell Collins and Lufthansa.  *Let. from Vladislav Kuzmin, attached as Ex. I.*

### Jail Time Credit and Undischarged Estonian Sentence

As the Court may be aware from the pretrial motions, even though there is a dispute as to whether the U.S. and Estonian prosecutions are in fact the same, the government would likely concede that there are strong substantive similarities.  Indeed, while the statutes are different with different elements the underlying computer fraud, with DNS changer at its core, was understood by the Estonian Courts in the context of how it was framed in the U.S. indictment, and the same or similar evidence and arguments that were vetted at the Estonian trial would likely have been replayed in the U.S. case if it went to trial here.  Thus, the charging differences are largely a function of form over substance.10

---

10 Unfortunately for Mr. Gerassimenko the law was not on his side and likely permits two prosecutions under the dual sovereignty doctrine.  *See Heath v. Alabama*, 474 U.S. 82 (1985); *Abbate v. United States*, 359 U.S. 187

13

# GLENN A. GARBER, P.C.
ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

Consequently, Mr. Gerassimenko was, in a real way, placed twice in jeopardy for the same offense. And, he is now called upon to answer in Estonia with another 22 months in jail, and likely in terribly harsh conditions intolerable by any humane standard. Therefore, equity under the circumstances of this case strongly militate in favor of considering the "double jeopardy" he endured especially given the onerous conditions of incarceration Mr. Gerassimenko already endured and will continue to suffer under upon his return to Estonia.

Here, for example, if the Court imposes a sentence of 42 or 48 months and credits Mr. Gerassimenko only for the time spent in Estonia awaiting extradition – 12 months – and for incarceration in the U.S. – 13 months – he will still serve additional time, unless the Court notes that some or all of the time in pretrial detention should be applied to the U.S. sentence. However, if the Court draws from Estonian pretrial time and so indicates at sentencing then Mr. Gerassimenko will likely serve more than 22 months in Estonia upon his return. Hence, if the Court believes that when all is taken into account Mr. Gerassimenko has been sufficiently punished, it is urged that a designation of "time served" be imposed here to prevent any adverse jail time calculations in Estonia that would further frustrate the sentence there.

In a similar vein, should this Court conclude that Mr. Gerassimneko has suffered enough and that the offenses in Estonia and the U.S. are substantially similar, in addition to imposing a time served sentence it should also indicate in the judgment that the crimes are "substantially similar" and it should recommend that the U.S. sentence run concurrently with the 22-month undischarged Estonian sentence such that it consumes it. If this Court does so, it will send a signal to that jurisdiction that may be taken into consideration and lead to Mr.

---

(1959). Moreover, he does fair better under the doctrine of *non bis in idem*; because while a foreign treaty can block extradition for re-prosecution for a substantially similar offense, the Estonian treaties are not clear enough in their wording to provide relief from double jeopardy.

14

# GLENN A. GARBER, P.C.
## ATTORNEYs AT LAW

GlENN A. GARBER
(ADMITTED IN NY & NJ)

THE WOOLWORTH BUILDING
233 BROADWAY, SUITE 2370, NEW YORK, NY 10279
TEL: 212-965-9370   FAX: 212-965-9375
www.glenngarber.com

Gerassimenko's release after his return, presumably after some delay associated with sentencing litigation in Estonia.11

### Conclusion

In sum, for all the reasons stated above it is requested that the Court impose a sentence of "time served" so Mr. Gerassimenko can rejoin his family, and get back on track as being a supportive and productive member of society.  In addition, it is requested that the judgement of conviction indicate that "because Mr. Gerrasimenko still faces a sentence of 22 months in Estonia based on his prior conviction for essentially the same conduct, it is recommended that his sentence run concurrently to the undischarged Estonian sentence."

Thank you for your consideration.

Respectfully submitted,

/s/

Glenn A. Garber

Cc:    AUSA Sarah Lai

---

11 This Court should also be mindful that Mr. Gerassimenko will be held-up in U.S. custody, likely for a number of months, after he completes his sentence and before he is returned to Estonia.

15